```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF PUERTO RICO
```

**UNITED STATES OF AMERICA,**

    Plaintiff,

      v.

**FRANCISCO TRINIDAD-RIVERA(1)**
**AILEEN RIVERA-BURGOS(2),**

    Defendants.

Crim. No. 14-004(GAG-PG)

**OPINION AND ORDER**

On December 3, 2013, the United States filed a criminal complaint against defendants Francisco Trinidad Rivera ("Trinidad") and Aileen Rivera Burgos ("Rivera"). Later, on January 2, 2014, the government indicted Trinidad for being a convicted felon in illegal possession of several firearms in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and Rivera for misprision of a felony in violation of 18 U.S.C. § 4.

The matter is before the undersigned on Trinidad's request to suppress the evidence against him (Docket No. 30, 74) filed on January 30, 2014, which defendant Rivera joined (Docket No. 67). The United States opposed defendants' motion to suppress on December 31, 2014 (Docket No. 77) and a hearing was held on June 30, 2015.

For the reasons discussed below, the undersigned finds that the officers' entry into Trinidad's home violated defendants' Fourth Amendment rights, and they are thus entitled to the suppression of the evidence seized from him. As such, the motion to suppress is **GRANTED**.

**I. FACTUAL FINDINGS**

After having opportunity to listen to the testimony proffered at the suppression hearing by PRPD Officers Richard Negron Aponte ("Negron"), Lieutenant Ferdinan Acosta ("Acosta"), Rafael Rivera Romero ("Rivera-Romero") and both defendants, the court will now summarize their statements herein.

*PRPD Officer Richard Negron Aponte*

Negron is an investigative officer at the Puerto Rico Police Department (PRPD), who partook in defendants' arrest. During the suppression hearing, Negron testified that in December of 2013, he was investigating the whereabouts of fugitive Ramon Ortiz Ramos ("Ramon" or "the fugitive"). According to Negron, he received a tip from an informant[1] that told him that the fugitive was hiding in a home in the municipality of Vega Baja. Negron testified that the evening prior to defendants' arrest, on or about eight or nine in the evening, he met with the informant, who pointed out the home where the fugitive was allegedly hiding. To questions from the prosecutor, the witness answered as follows:

> Q. ALL RIGHT. AND AT SOME POINT THAT NIGHT DID YOU OBSERVE THE FUGITIVE?
>
> A. YES. WHILE I'M DRIVING WITH THE INFORMANT, THE INFORMANT POINT OUT: LOOK AT RAMÓN RIGHT THERE, AND HE WAS CROSSING THE STREET.
>
> Q. WHERE DID YOU OBSERVE HIM GOING?
>
> A. TOWARD THE HOME.
>
> Q. AND WHAT DID YOU DO? DID YOU ATTEMPT TO ARREST HIM AT THAT MOMENT?
>
> A. NO.
>
> Q. WHAT DID YOU DO NEXT?
>
> A. I EXITED THE AREA, I EXITED THE DEVELOPMENT, I CALLED THE DIRECTOR OF MY OFFICE, LIEUTENANT ACOSTA. I INFORMED HIM OF THE SITUATION AND HE TOLD ME: LET'S WORK ON THAT, TO THEN COME IN THE EARLY MORNING HOURS.

*Transcript of Suppression Hearing ("Transcript")*, page 8. Negron testified that he returned to the residence in question in the early morning hours of December 3rd, 2013 with a group of more than ten task force officers of the Federal Marshal Service and members of the PRPD.

---

[1] The reliability and credibility of this confidential informant is unknown to the court.

They were armed with rifles, shields and bullet-proof vests. Negron admitted to not having a warrant to enter this house.

Notwithstanding, Negron testified that the marshals went up a set of stairs and through a hallway before knocking on a door of the second floor of the house. And while admitting they went through a gate before being able to climb the set of stairs that leads to this second story,[2] he denied seeing the gate was locked with a padlock or seeing any one of the officers ahead of him break a padlock to enter the premises.[3] *Transcript*, pages 41-44.

Negron identified defendant Trinidad as the man that answered the door and came out. Negron confirmed to the rest of the officers that Trinidad was not the fugitive and according to him, Trinidad walked out into the second-floor balcony to be interviewed. The defendant admitted knowing the fugitive but denied he was in his house. To that effect, Negron testified:

> Q. AND AS YOU WERE SPEAKING WITH THE DEFENDANT, WHERE WERE THE MARSHALS?
>
> A. AT THE DOOR, THEY WERE OUTSIDE STILL WAITING.
>
> Q. ALL RIGHT. NOW, AT SOME POINT DID YOU ASK THE DEFENDANT IF YOU COULD ENTER THE APARTMENT?
>
> A. I ASKED HIM IF WE COULD GO INSIDE TO CHECK IF RAMÓN WAS THERE.
>
> Q. AND WHAT DID THE DEFENDANT SAY?
>
> A. HE SAID: IF IT'S TO GO IN TO LOOK FOR RAMÓN, THERE'S NO PROBLEM.
>
> Q. AND AFTER THE DEFENDANT STATED THAT TO YOU, WHAT DID YOU DO NEXT?
>
> A. NO, THEN IT WAS THE LIEUTENANT WHO GAVE THE INSTRUCTIONS TO –
>
> Q. WHO GAVE THE INSTRUCTIONS TO WHO?

---

[2] Government Exhibit No. 2 depicts a two-story house with a gate on the left-hand side. Behind the gate is a stairway that leads to a balcony in the second story of the house.
[3] Defendants' Exhibit F is a zoomed image of the gate depicted in a photo taken by and provided to him by the government, which the defendants argue show a padlock hanging from the gate's handle.

```
              A. LIEUTENANT ACOSTA.

              Q. WHAT DID LIEUTENANT ACOSTA INSTRUCT THE
              MARSHALS TO DO?

              A. TO GO IN AND CHECK AND SEE IF THE FUGITIVE WAS
              INSIDE.
```

*Transcript*, pages 18-19. According to Negron, defendant Trinidad did not ask whether the agents had a warrant nor told them that without a warrant they could not enter the house. *Transcript*, page 46. After going in, Negron stated that he saw defendant Rivera and two minors in the living room. Negron described that after the search team entered the house, Trinidad followed them and, in turn, Lieutenant Acosta followed after Trinidad. *Transcript*, page 48. After the search, Negron claims one of the agents showed a rifle he found. Id.

On cross-examination, Negron admitted he never saw the fugitive go inside Trinidad's home, just crossing the street in the vicinity of the home, and that seven to eight hours elapsed between the time he saw the fugitive and the PRPD officers' arrival to Trinidad's home. See *Transcript*, page 39-40.

<u>Lieutenant Ferdinan Acosta</u>

Acosta also works for the PRPD. He testified that on December 2nd, 2013, he received a phone call from Negron requesting the personnel and support to arrest the fugitive. In response, Acosta asked Negron to prepare to go in the next day, which they did on December 3, 2013 during the early morning hours along with twelve (12) to fourteen (14) agents. Acosta testified that he was not aware of any locks being broken to ascend to the second floor of the house through the stairway. See *Transcript*, pages 56-57. Acosta also stated that defendant Trinidad walked a couple feet out of the door towards the agents after opening the door, at which point Acosta and Negron asked him some questions about Ramon. According to the Lieutenant, he asked Trinidad if they could go inside to look for the fugitive and Trinidad

Case 3:14-cr-00004-GAG-PG   Document 112   Filed 09/14/15   Page 5 of 14

Crim. No. 14-004(GAG-PG)                                                    Page 5

responded: "If you are going to look for Mr. Ortiz, it's okay."[4] See *Transcript*, page 60. After ordering the marshals to go in, Acosta testified that he had to stop Trinidad from following quickly after the marshals. Meanwhile, defendant Rivera screamed at him.

> Q. AND AFTER HE SAID THAT TO YOU, WHAT DID YOU DO NEXT?
>
> A. THE MARSHALS WERE LOOKING AT ME. I TOLD HIM, OKAY, GO AND LOOK FOR MR. ORTIZ. THEY KNOW THEIR JOB. I TOLD HIM: GO. TOLD THEM: GO. AND AT THAT TIME THE DEFENDANT MAKE [sic] AND [sic] ABOUT FACE AND START [sic] WALKING FAST BEHIND THE MARSHALS THAT WERE TRYING TO CLEAR THE RESIDENCE.
>
> Q. ALL RIGHT. AND WHAT DID YOU DO AFTER THE DEFENDANT FOLLOWED THE MARSHALS INSIDE THE RESIDENCE?
>
> A. I TRIED TO STOP HIM, NOT TO GRAB HIM BUT TO STOP HIM. **I TRIED TO RUN AFTER HIM -- NOT TO RUN, BUT TO WALK FAST, LIKE HE WAS, AND TRY TO KEEP HIM CALM.** AND I WAS TELLING HIM TO STOP WALKING AND LET THEM SEARCH THE PREMISES BECAUSE OF HIS OWN SAFETY BECAUSE IF SOMEBODY WAS HIDING AND HAD A WEAPON MAYBE HE CAN GET HURT.
>
> I -- AT THE SAME TIME I WAS LOOKING AT THE -- AT THE LADY WHO WAS ON THE FLOOR ON A MATTRESS WITH, I THINK IT WAS, TWO LITTLE BOYS. **THEY WERE SCREAMING AT THAT TIME.**

See *Transcript*, pages 60-61 (emphasis ours). Shortly thereafter, the Lieutenant stated that one of the marshals showed him a rifle that had been found because it was visible in one of the bedrooms. At that point, he placed Trinidad under arrest, which Trinidad resisted. After Trinidad was under arrest, one of the agents saw an unzipped black fanny pack with a firearm inside.[5] According to Acosta, the fanny pack was open and in plain view. During the search of the rooms in the

---

[4] During cross-examination, Lieutenant's recollection of defendant Trinidad's response to their request to search his home was as follows:
> Q. AND IT'S YOUR TESTIMONY HERE IN COURT THAT HE VOLUNTARILY SAID: COME IN AND SEARCH MY RESIDENCE?
> A. YES, SIR, **WELCOME INTO MY RESIDENCE.**

See *Transcript*, page 77 (emphasis ours).

[5] See Government's Exhibit 4.

home, one of the agents told him he had found gun barrels, rifle barrels and a live hand grenade, as well as official PRPD identifications and badges, other dummy badges, bullet-proof vests, police raid jackets, a U.S. Customs raid jacket and firearm magazines. Acosta claimed that agent Rafael Rivera found most of the evidence gathered.

*Rafael Rivera-Romero*

Rivera-Romero is employed by the PRPD as a task force officer with the United States Marshal Service. He was part of the entry team during the search for Ramon Ortiz at the home of Mr. Trinidad. Rivera-Romero testified that the entry team officers did not have to break any locks in order to go through the gate that leads to the stairway towards the second floor of the house in question.[6] Nevertheless, they had the equipment to do so just in case they had to. Upon entry, he saw a woman and two children in the living room area before moving on to search the bedrooms. He described the woman as being "hysterical at the moment." See Transcript, at page 114.

With regards to the breadth of the search, Rivera-Romero testified as follows:

> Q. NOW, WHEN -- AS PART OF THE ENTRY TEAM IF YOU WERE LOOKING FOR A FUGITIVE, WHAT TYPES OF -- WHERE DO YOU LOOK FOR AN INDIVIDUAL WHEN YOU ENTER A HOUSE TO LOOK FOR A FUGITIVE?
>
> A. FROM MY EXPERIENCE IN THE YEARS THAT I'VE BEEN WORKING FOR IN THE VIOLENT FUGITIVE TASK FORCE, WE'VE FOUND INDIVIDUALS IN CLOSETS, UNDER BEDS, KITCHEN CABINETS, BATHROOMS AND [sic] **EVEN SUITCASES**.

---

[6] The transcript of Rivera-Romero's testimony states as follows:

> Q. (BY MR. CASTRO) YOU MEAN TO SAY THAT AT 3:30 IN THE MORNING, YOU FREELY, WITHOUT ANY OBSTRUCTION, JUST WALKED UP THOSE STAIRS?
>
> A. YES.

See Transcript at page 113.

See *Transcript*, pages 94-95 (emphasis ours). According to Rivera-Romero, he saw a rifle immediately after opening the closet of the first bedroom he searched.[7] In the same closet, he claims to have found police jackets, bullet-proof vests, firearm magazines, a loaded 223 rifle, and clothes from the Puerto Rico Electric Power Authority and helmets. He claims he could see these items in plain view. In fact, according to him, most the evidence gathered was in plain view dispersed among the different rooms of the home.

*Defendant Aileen Rivera*

Defendant Rivera testified that on the day of her arrest she was at Trinidad's house because they were a couple and it was her birthday, which they were going to celebrate together. It had been approximately a month since Rivera had moved back to Puerto Rico from Orlando. That night, Trinidad, Rivera and her two children – ages ten and seven - all slept in the living room area because the only air conditioning unit in the residence was in the living room. In fact, she claims that she had visited Trinidad often, but rarely went beyond the living room for that same reason. Moreover, she had never seen the evidence that the police officers found in the apartment that night. Rivera claims that on the evening prior to their arrest, between eight or nine in the evening, they had closed the gate that leads to the staircase with a padlock after they arrived. Later, on or about three in the morning, she heard a loud noise as if people were jumping over the railing of the second floor of the house. See *Transcript*, at page 122. According to Rivera, Francisco "opened the door a little bit – he was inside the house, they [the police officers] were outside." See *Transcript*, at page 123. Then, Rivera claims that the agents opened the door and all went inside the house at once. Rivera testified that all except one officer exited the house after not finding the person

---

[7] The record shows that Rivera-Romero removed the rifle from the closet, showed it to Lieutenant Acosta and then placed it back in the closet in order to take the photograph that was admitted as Government's Exhibit 10. Therefore, the photograph only reflects how the rifle was put back into the closet. In fact, Rivera-Romero admitted that most of the pictures admitted in evidence as Government Exhibits during the course of this hearing did not reflect the state in which the evidence was found.

they were looking for. However, they all returned inside after one of the agents saw a holster.

*Defendant Francisco Trinidad*

Trinidad testified that he had been residing in the second story of the house where he got arrested for three years. It was his testimony that the gate that stands before the stairway that leads to the second floor was locked with a padlock on December 3rd, and that to go up those stairs, the officers had to break the padlock in order to gain access to that stairway. After the officers identified themselves as PRPD, Trinidad stated that he opened the door "ajar" and saw several policemen in tactical uniform with helmets, masks, shields and firearms, which made him feel intimidated. Trinidad claims he told the agents that Ramon was not in his house, but one of the agents replied that he had a tip that Ramon was there, that they had an arrest warrant for Ramon and they were going in to search. Trinidad claims he asked the agents if they had a search warrant for the property, which the agents denied. Trinidad asserted he told the police officer that if they didn't have a warrant, he couldn't go in. See *Transcript*, page 141. But when Trinidad turned around to ask Rivera to get dressed, he testified that the officers all entered the home without his consent.

While some officers searched the home, one officer started asking him about Ramon.

> A. THE LIEUTENANT, THE OFFICER STARTED ASKING ME WHERE WAS RAMON. I TOLD HIM I DIDN'T KNOW WHERE RAMON WAS. THEN HE TOLD ME: SO YOU KNOW HIM? I TOLD HIM I KNOW WHO HE IS BUT I DON'T KNOW HIM. AND HE ASKED ME: WHERE DO YOU KNOW HIM FROM? I TOLD HIM HE LIVED IN THE SAME COMMUNITY BUT THAT WE WEREN'T FRIENDS. AND THEN HE TOLD ME I HAVE A TIP THAT HE WAS HERE AND I SAW HIM LAST NIGHT. AND I TOLD HIM THAT IT WAS IMPOSSIBLE THAT YOU HAD SEEN HIM BECAUSE HE HAS NO REASON TO COME TO MY HOUSE. AND THEN HE TOLD ME HE WAS HERE AND I SAW HIM THERE.
>
> Q. WHEN YOU SAY (SPANISH) AND YOU ARE POINTING WITH YOUR FINGER, WHAT ARE YOU –

>           A. HE WAS SIGNALING TOWARDS THE ROAD AND HE TOLD
>           ME: I SAW HIM THERE, AND THOSE TWO CARS WERE
>           UNDER THE TREE. AND THEN I TOLD HIM THOSE TWO
>           CARS WERE UNDER THE TREE AND IF YOU SAW HIM
>           THERE, THAT'S NOT PART OF MY PROPERTY AND HE
>           WASN'T HERE.

See *Transcript*, page 144. Afterwards, the officer threatened him saying that if Trinidad did not tell him where Ramon was, he was going to arrest Trinidad for stealing electricity. Trinidad then ordered them to leave, but then the officers saw a holster lying under the dining room table. Immediately thereafter, Trinidad claims he was handcuffed and the officers came back into his apartment to proceed with a search he did not consent to. According to the defendant, the officers found some disassembled firearms inside a suitcase they had opened. In fact, according to the defendant, all these ammunitions were in suitcases and closed bags inside the closet of one room and the uniforms and caps were inside some duffel bags inside another closet. Contrary to the officers' testimony, he claimed that the government exhibits of the evidence gathered - including the firearms, ammunition and articles of clothing – did not accurately reflect its state prior to their search because the police moved everything from the places where they were. Finally, after finding these firearms, Trinidad testified the Lieutenant slammed him against a wall and punched him.

## II. LEGAL ANALYSIS

In the motion to suppress, defendants argue that the evidence obtained during the search warrants suppression because the entry into Trinidad's home violated defendants' Fourth Amendment rights and was thus unlawful.[8] According to defendants, the police officers did not have a search warrant to enter Trinidad's home and failed to obtain his consent to enter his apartment. See Docket No. 30, 74. In

---

[8] In his motion to suppress, Trinidad also argued that the physical and testimonial evidence should also be suppressed because it was obtained in violation of his Fifth Amendment rights. See Docket No.30. The argument was neither expanded in the motion or the suppression hearing. To that effect, the prosecutor stated that he believed the controversy before the court was only a Fourth Amendment issue and that "either the statements and all the evidence is in or it's all out." *Transcript*, at page 172. Given the government's waiver, we find it unnecessary to delve into the possible Fifth Amendment violations.

Case 3:14-cr-00004-GAG-PG   Document 112   Filed 09/14/15   Page 10 of 14

Crim. No. 14-004(GAG-PG)                                              Page 10

response, the government argues that Trinidad validly consented to the law enforcement officers' entry into his home and the evidence seized was in plain view. See Docket No. 77.

**A. Fourth Amendment Claims**

The Fourth Amendment to the U.S. Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." U.S. Const. amend. IV. "The text of the Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1856 (2011) (citing Payton v. New York, 445 U.S. 573, 584 (1980)). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." U.S. v. Montoya de Hernandez, 473 U.S. 531, 537 (1985) (citing New Jersey v. T.L.O., 469 U.S. 325, 337-342 (1985)).

"It is a basic principle of Fourth Amendment law … that searches and seizures inside a home without a warrant are presumptively unreasonable." King, 131 S.Ct. at 1856 (internal quotation marks omitted) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). In Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341 (1914), the Supreme Court adopted the federal exclusionary rule for evidence that was unlawfully seized from a home without a warrant in violation of the Fourth Amendment. See Hudson v. Michigan, 547 U.S. 586, 590 (2006). Therefore, exclusion of the evidence obtained by a warrantless search vindicates a citizens' entitlement under the Fourth Amendment to shield their persons, houses, papers, and effects from the government's scrutiny. Id. at 593.

Notwithstanding, "[t]he Fourth Amendment does not forbid any and all warrantless incursions on the person and property of an individual." U.S. v. Gamache, 792 F.3d 194, 198 (1st Cir.2015). "Although a warrantless entry into an individual's residence is presumptively unreasonable, a valid consent to the entry by a person

with apparent authority vitiates any Fourth Amendment concern." Id. (internal citations omitted).

"Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given." U.S. v. Marshall, 348 F.3d 281, 285-286 (1st Cir.2003) (citing United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir.2000)). "Consent is voluntary if it is the product of an essentially free and unconstrained choice." U.S. v. Chhien, 266 F.3d 1, 7 (1st Cir.2001) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). The test of voluntariness requires the court to determine whether an individual's will has been overborne and his/her capacity for self-determination critically impaired. See Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). "Whether consent was voluntary or the result of coercion is a question of fact to be determined from an examination of the totality of circumstances. … Factors to be considered include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Marshall, 348 F.3d at 286 (internal citations omitted).

"An ordinary person who knocks on a door and receives assent may properly consider himself an invited guest, and would be so considered by the courts … ." Robbins v. MacKenzie, 364 F.2d 45, 49 (1st Cir.1966). "Still, consent to enter a home does not, by itself, give law enforcement officers carte blanche to rummage through the premises and perform a general search. After all, a warrantless search may not exceed the scope of the consent obtained." Gamache, 792 F.3d at 198 (citing United States v. Marshall, 348 F.3d 281, 286 (1st Cir.2003)).

Here, the court heard two opposing versions regarding the circumstances surrounding the officers' entry into Trinidad's home and the consent he gave. As shall be discussed, the court finds truth in the defendants' account.

On the one hand, the officers testified that they freely opened the gate that lead them without obstacle to the second floor of the house where Trinidad resided and Rivera was staying as a guest. In contrast, Rivera testified that they locked the gate with a padlock

Case 3:14-cr-00004-GAG-PG   Document 112   Filed 09/14/15   Page 12 of 14

Crim. No. 14-004(GAG-PG)                                            Page 12

the evening prior to their arrest. In addition, defendant Trinidad testified that the only way the officers could have reached the door of his home was by breaking a padlock that locked the gate on the first floor of the two-story house that gave way into the staircase and up to his balcony. This the officers vehemently deny. But considering the extraordinarily high rate of criminal activity in Puerto Rico,[9] as well as the nature of Trinidad's possessions, the court simply cannot believe that the defendant left the gate unlocked through the night, especially having his girlfriend and her two minor children as guests. As to this particular, the defendants' assertions are simply more credible.

Now, after knocking on the door, both Negron and Lieutenant Acosta testified that Trinidad walked out into the balcony of his home to talk to them. Both officers claim to have been the ones to ask Trinidad whether they could enter his home to search for Ramon Ortiz, and both testified that Trinidad allowed them in without hesitation. According to Negron, Trinidad said: "no problem"; whereas, Lieutenant Acosta recalled Trinidad saying "it's okay" and "welcome into my residence." In fact, according to Negron, Trinidad did not even ask them if they had a search warrant.

Conversely, both Rivera and Trinidad testified that the latter did not walk out into the balcony after opening the door. Instead, they both stated that Trinidad stayed behind the door of his house without opening it completely. After denying that the fugitive for whom they had an arrest warrant was in his house, Trinidad testified he asked the officers if they had a search warrant. After they admitted to not having one, Trinidad denied their entry. However, he claims the officers took advantage of a moment he turned around to talk to Rivera and let themselves in without his consent.

The officers, thus, expect the court to believe that defendant Trinidad voluntarily consented to a warrantless search inside his home despite being a convicted felon in illegal possession of firearms and

---

[9] See U.S. v. Melecio-Heredia, No. 11-521-01 2012 WL 2450813, at *1 (D.P.R. June 25, 2012) ("The First Circuit has recognized the troublesome picture in Puerto Rico, where crime far exceeds the known limits in the mainland.") (citing Watchtower Bible and Tract Soc'y of New York, Inc. v. Sagardía de Jesús, 634 F.3d 3, 6 (1st Cir.2011)).

other paraphernalia, which were all lying in plain view inside the rooms and closets that would naturally be searched by more than a dozen police officers. The court will not. Considering his background and personal circumstances, Trinidad does not appear to the undersigned as likely to have consented voluntarily to the entry by the officers. As a convicted felon, Trinidad must have been apprised of his rights on previous occasions and was familiar, as he testified he was, with his constitutional right to refuse to give his consent to a search and to demand that a search warrant be obtained for such purposes.

The facts of this case and the inferences therefrom point strongly in favor of the defendants' version of events, and the court simply cannot believe what reasonable men would not. Consequently, defendants' account is more credible.

Actually, the court finds that there are details in Lieutenant Acosta's testimony that support defendants' version. For example, the Lieutenant recounted that he had to run behind Trinidad immediately after the officers' entry into his home to stop him from following them and even had to calm him down. He also testified that Rivera and her two minor sons were screaming at the time. If Trinidad acquiesced so willingly to their entry, it does not follow that he reacted with such jolt and that his girlfriend and her children were so terrified. These facts lead the court to largely credit the testimony of Trinidad over that of the officers concerning the circumstances of their entry.

Moreover, the officers' belief that the fugitive was hiding in a home in Trinidad's neighborhood consists of – to our knowledge – an imprecise, uncorroborated tip from a confidential informant whose reliability this court ignores. In fact, officer Negron readily admitted that he did not see the fugitive actually enter Trinidad's home, but only crossing the street towards it. In this context, we find that the officers could not have formed a reasonable belief that Ramon Ortiz was inside Trinidad's home some six to eight hours after Negron claims he saw the fugitive in that vicinity.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not

Case 3:14-cr-00004-GAG-PG   Document 112   Filed 09/14/15   Page 14 of 14

Crim. No. 14-004(GAG-PG)                                                    Page 14

reasonably be crossed without a warrant." Payton, 445 U.S. at 590. The officers here failed to secure a search warrant. Both Trinidad and Rivera[10] had a reasonable expectation of privacy in the former's home, and the court credits Trinidad's testimony that he did not consent to the officers' entry into his residence. The officers thus entered the house unlawfully and the evidence seized therein was the fruit of this constitutional violation.[11] The firearms and all other items found, which the police claim were in plain view,[12] was the but-for result of this preliminary misstep.

Regrettably, our determination comes at a high price insofar as "[t]he exclusionary rule generates substantial social costs, … , which sometimes include setting the guilty free and the dangerous at large." Hudson v. Michigan, 547 U.S. at 591 (internal citations and quotation marks omitted). But having taken into account the totality of the circumstances and the witnesses' demeanor, credibility and appearance, we are forced to find that Trinidad is entitled to the suppression of the evidence seized in his home.

### III. CONCLUSION

For the reasons set forth herein, the court hereby **GRANTS** the defendants' motion to suppress.

**IT SO ORDERED.**

In San Juan, Puerto Rico, September 14, 2015.

                              **S/ JUAN M. PÉREZ-GIMÉNEZ**
                              **JUAN M. PÉREZ-GIMÉNEZ**
                              **UNITED STATES DISTRICT JUDGE**

---

[10] In Minnesota v. Olson, 495 U.S. 91 (1990), the Supreme Court held that overnight guests have a legitimate expectation of privacy in their host's home. Id. at 98.

[11] See U.S. v. Werra, 638 F.3d 326, 341 (1st Cir.2011) (finding defendant was entitled to suppression of evidence where officers lacked sufficient evidence to form reasonable belief that individual they sought to arrest was in defendant's residence at the time they entered).

[12] During the course of their testimony, the officers emphasized the fact that the firearms, ammunition and impersonation clothing they found was all in open bags and inside the closets of the rooms they searched lying in "plain view." On the contrary, Trinidad claims the evidence seized was in suitcases and duffel bags that were closed. Once again, the court finds it hard to believe that the defendant had firearms and rifles visibly placed and readily accessible to two minors who were staying that night in his residence, or that Rivera, as the children's mother, would allow that to be the case.